**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| vs. | No. 1:15-CV-05839 |
| YUMIN LI, and KERING CAPITAL LTD, | Hon. Sara L. Ellis |
| Defendants, | |
| KERING CAPITAL LTD, | |
| Relief Defendant. | |

**YUMIN LI'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 2

    A.   Ms. Li's Tenure at Tanius ....................................................................... 2

    B.   Ms. Li Suffered Through Injustice and Exploitation at Tanius ............................. 4

    C.   The Trading at Issue ................................................................................ 4

    D.   Post-Trading Issues ................................................................................. 4

III. ARGUMENT ....................................................................................................... 6

    A.   Legal Standard ......................................................................................... 6

    B.   The CFTC's Section 4b Claim Fails ....................................................... 7

    C.   The $901,387.50 Civil Penalty Sought By The CFTC Bears No Rational
Relationship to Ms. Li's Alleged Violations ...................................... 10

        1.   The Relationship of the Alleged Violations to the Regulatory Purpose
Does Not Support the Requested Civil Penalty ..................................... 11

        2.   The Trading Arose From Unique Circumstances, Which Present Particular
Mitigating and Aggravating Factors ........................................... 13

        3.   Ms. Li Did Not Benefit From The Trading .............................................. 15

        4.   Ms. Li Did Not Harm the Market or Investors ........................................ 15

        5.   Ms. Li's Cooperation and Other Post-Violation Conduct Weigh in Favor
of no Penalty ........................................................................ 16

        6.   Ms. Li Could Not Cure the Violations or Provide Restitution ................ 17

    D.   An Injunction Permanently Enjoining Ms. Li From Futures Trading and Future
Violations is Not Necessary or Warranted ........................................... 18

IV.  CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**CASES**

*Alaska Dep't of Envtl. Conservation v. EPA,*
  50 U.S. 461 (2004) ....................................................................................... 9

*Brumfield v. City of Chicago,*
  735 F.3d 619 (7th Cir. 2013) ....................................................................... 9

*CFTC v. Brockbank,*
  505 F. Supp. 2d 1169 (D. Utah 2007) ................................................... 11, 13

*CFTC v. Capitalstreet Fin., LLC,*
  2012 WL 79758 (W.D.N.C. Jan. 11, 2012) ................................................ 13

*CFTC v. Cloud*, Civil,
  2011 WL 1157530 (S.D. Tex. Mar. 24, 2011) ........................................... 13

*CFTC v. Levy,*
  541 F.3d 1102 (11th Cir. 2008) .................................................................. 11

*CFTC v. Noble Wealth,*
  90 F. Supp. 2d 676 (D. Md. 2000) .............................................................. 11

*CFTC v. PMC Strategy, LLC,*
  903 F. Supp. 2d 368 (W.D.N.C. 2012) ....................................................... 13

*CFTC v. Singhal,*
  Case No. 12 cv 00138 (N.D. Ill. Nov. 28, 2012) .................................. 11, 12

*CFTC v. Song,*
  Case No. 10 civ 2931(S.D.N.Y. April 11, 2011) ................................. 9, 10, 12

*CFTC v. Supama Int'l DMCC,*
  Case No. 07 CV 2770 (S.D.N.Y. April 8, 2008) ..................................... 9, 12

*CFTC v. U.S. Metals Depository Co.,*
  468 F. Supp. 1149 (S.D.N.Y. 1979) ............................................................ 12

*Ctr. for Biological Diversity v. Abraham,*
  218 F. Supp. 2d 1143 (N.D. Cal. 2002) ..................................................................... 7

*Gunville v. Walker,*
  583 F.3d 979 (7th Cir. 2009) ..................................................................................... 8

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund,*
  778 F.3d 593 (7th Cir. 2015) ..................................................................................... 7

*Indianapolis Minority Contractors Ass'n v. Wiley,*
  1998 WL 1988826 (S.D. Ind. May 13, 1998) ............................................................ 7

*In the Matter of Benjamin Hutchen,*
  CFTC Docket No. 13-07 ........................................................................................... 20

*In the Matter of FirstRand Bank, Ltd,*
  CFTC Docket No. 14-23 ........................................................................................... 10

*In the Matter of Fan Zhang,*
  CFTC Docket No. 14-33 ...................................................................................... 10, 12

*In the Matter of Pak Tong Lui a/k/a/ Patrick Lui,*
  CFTC Docket No. 07-06 ........................................................................................... 20

*JCC, Inc. v. CFTC,*
  63 F.3d 1557 (11th Cir. 1995) ................................................................................. 12

*Johnson v. Hix Wrecker Serv., Inc.,*
  651 F.3d 658 (7th Cir. 2011) ..................................................................................... 8

*Marx v. Gen. Rev. Corp.,*
  133 S. Ct. 1166, 185 L. Ed. 2d 242 (2013) .............................................................. 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ................................................................................................... 8

*Meyers v. CFTC,*
  1994 WL 362727 (9th Cir. July 13, 1994) ................................................................. 8

*Monieson v. CFTC,*
    996 F.2d 852 (7th Cir. 1993) ................................................................. 11

*Puffer v. Allstate Ins. Co.,*
    614 F. Supp. 2d 905 (7th Cir. 2009) ...................................................... 9

*R&W Technical Servs. Ltd. v. CFTC,*
    205 F.3d 165 (5th Cir. 2000) ................................................................. 11

*Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.,*
    971 F.2d 37 (7th Cir. 1992) ................................................................... 7

*Scherr v. Marriott Int'l, Inc.,*
    703 F.3d 1069 (7th Cir. 2013) ........................................................... 9, 10

*Sterk v. Redbox Automated Retail, LLC,*
    2012 WL 3006674 (N.D. Ill. July 23, 2012) ....................................... 9, 10

*Univ. Healthsystem Consortium v. UnitedHealth Group, Inc.,*
    68 F. Supp. 3d 917 (N.D. Ill. 2014) ........................................................ 8

**STATUTES**

7 U.S.C. § 13a-1(d)(1)(A) .................................................................. 10
7 U.S.C. § 6b ....................................................................................... 2
7 U.S.C. § 6b(a)(1)(A), (C) .................................................................. 9
7 U.S.C. § 6c ....................................................................................... 2
7   U.S.C. § 6c(a)(2)(A)(ii) .................................................................. 9

**RULES**

Fed. R. Civ. P. 56(a) ............................................................................ 7
Fed. R. Civ. P. 56(c)(2) ........................................................................ 8

**REGULATIONS**

17 C.F.R. § 143.8(a)(1)(ii) (2012) ...................................................... 11

## I. INTRODUCTION

Defendant Yumin Li did not commit fraud.  She did not harm or steal from investors.  And she did not harm the market.  But Ms. Li, a gifted commodities trader, did make a terrible mistake.

She made an impulsive decision to conduct a money pass, using off-hour Eurodollar trading to move funds from her employer's account to an account held by Kering Capital, Ltd. ("Kering").  She only came to this rash course after suffering two years of broken promises, mistreatment, and injustice at the hands of Gary Middlemiss ("Middlemiss"), the principal of Tanius Technology LLC ("Tanius"), Ms. Li's former employer.  She intended these trades to offset money owed to her, which she believed could not be redressed by any other means.  She acknowledges and now understands that the money pass was ill-advised and wrongful.

Plaintiff Commodity Futures Trading Commission ("CFTC") now seeks summary judgment against Ms. Li on its fraud claim under Section 4b(a) of the Commodities Exchange Act ("CEA"), 7 U.S.C. § 6b ("Section 4b"), a civil penalty of over $900,000, and a permanent trading ban.  The circumstances that led to Ms. Li's decision to engage in the money pass, as well as the manner in which she carried the trades, demonstrate that she did not commit fraud and that the Court should impose, at most, a much smaller civil penalty.

The CFTC's fraud claim fails for two reasons.  First, the CFTC cannot show that Ms. Li was not authorized to trade Eurodollar futures using Middlemiss' personal trading account because trading Eurodollar futures using Middlemiss' personal trading account was precisely her job at Tanius.  This is not a situation where a broker is trading in a customer account without authorization.  Second, the CFTC's fraud claim under Section 4b is duplicative of its claim under Section 4c of the CEA, 7 U.S.C. § 6c, which prohibits, among other things, a money pass.  Not every money pass violation is a fraud violation, and the CFTC's characterization of this money pass as a Section 4b fraud violation must be denied because the claim renders Section 4c superfluous.  Indeed, the CFTC has often declined to bring fraud claims under Section 4b for money pass transactions and should not have done so here.

LI'S MPA ISO OPPOSITION TO MSJ
No. 1:15-CV-05839

Nonetheless, even if the Court were to find Ms. Li liable under Section 4b or 4c of the CEA, the remedies sought by the CFTC are extreme and unwarranted. In many money pass cases, defendants are typically ordered to pay smaller penalties than in fraud cases. The CFTC has asked the Court to impose a penalty of over $900,000, representing three times the amount transferred in the money pass, $300,462.50. Applying the relevant penalty factors to the facts here shows that the $900,000 penalty bears no rational relationship to Ms. Li's money pass violations. Among other things, her mistreatment by Middlemiss and Tanius present unique circumstances that mitigate against a large penalty (or, indeed, any penalty at all); Ms. Li's off-hours trading, by the CFTC's own admission, did not harm any investors or the market; Ms. Li did not benefit from the trading because she never received the funds; and Ms. Li has been cooperative with the CFTC throughout the investigation and litigation of this action.

Moreover, the CFTC's requested permanent trading ban is also excessive in light of the nature of Ms. Li's conduct. The circumstances leading up to Ms. Li's decision to conduct the money pass, her acknowledgement and recognition of the wrongfulness of her trading, her assurances that she will not engage in similar conduct in the future, and her lack of scienter indicate that she is unlikely to commit violations in the future. As such, the CFTC cannot satisfy its burden to show a reasonable likelihood of future violations necessary to obtain a permanent trading ban.

Accordingly, Ms. Li respectfully requests that the Court deny the CFTC's motion for summary judgment, and if it is inclined to grant the motion, Ms. Li further requests that the Court order no, or a limited, civil penalty, and no, or a limited, trading ban.

## II.    STATEMENT OF FACTS

### A.    Ms. Li's Tenure at Tanius

After graduating from the University of Chicago with a Master's Degree in Statistics and with significant experience trading Eurodollar futures, Ms. Li found employment at Tanius, a Bay Area-based trading firm. Joint Statement ("Jt. St.") (Dkt. No. 46), at at ¶¶ 5-7. Tanius profited handsomely from this relationship, with Ms. Li earning over $3.6 million in net profits

from her trading—including approximately $200,000 from March to May 2015, when the trading at issue in this litigation occurred. *See* Declaration of Defendant Yumin Li in Support of Yumin Li's Opposition to Plaintiff CFTC's Motion for Summary Judgment ("Li Dec."), attached as Ex. 1 to Defendant Yumin Li's Response to the Joint Statement of Undisputed Facts, at ¶¶ 2, 9.

Ms. Li began her employment on February 1, 2013. Jt. St. (Dkt. No. 46), at ¶ 7. Initially she performed market research, then was promoted to trader on her successful completion of the Series 7 examination. *See* Li Dec., at ¶¶ 11, Ex. C; 24. On February 20, 2013, however, Middlemiss authorized Ms. Li to trade using his personal trading account ("8202…"). *See* Li Dec., at ¶¶ 21, Ex. G at Interrogatory No. 3; 25. As a trader, Ms. Li regularly worked in excess of sixteen hours a day in addition to weekends and holidays. *See* Li Dec., at ¶ 22, Ex. H at ¶ 8. She was the only female trader and one of a handful of traders of Asian descent. *See id.* She was also the most profitable manual trader at Tanius. *See* Li Dec., at ¶ 3, Ex. A at TAN 20151211 E-422 through E-425. Yet she still received a smaller percentage of net trading profits than some white, male, U.S. citizen traders working at Tanius. *See* Li Dec., at ¶ 17.

Ms. Li traded for Tanius on Middlemiss' Trading ID and personal account rather than a Tanius 106.J equity member firm membership with the Chicago Mercantile Exchange ("CME"). *See* Li Dec., at ¶¶ 23-24. Ms. Li was authorized to trade Eurodollar futures on Middlemiss' trading ID and personal account. *See* Li Dec., at ¶¶ 23, 25. Ultimately Ms. Li discovered this fraudulent practice and learned that it allowed Tanius to avoid paying significant fees for its traders' non-member trading. *See* Li. Dec., at ¶ 21, Ex. G at Interrogatory No. 18. At this point, after numerous unjust and exploitative experiences at Tanius, Ms. Li had had enough, *see* Section II.B, *infra*, and sought to take matters into her own hands, *see* Section II.C, *infra*. *See* Li Dec., at ¶ 38.

In addition to this misguided self-help, Ms. Li also filed a whistleblower complaint with the CFTC. *See* Li Dec., at ¶ 47. She submitted a Form TCR on June 26, 2015, prior to the commencement of this action. *Id*. In this complaint, Ms. Li alerted the CFTC to certain conduct by Middlemiss at Tanius that she understood to be in violation of the Commodities Exchange

LI'S MPA ISO OPPOSITION TO MSJ
No. 1:15-CV-05839

Act, CFTC Regulations, or CME Regulations. Li Dec., at ¶ 48. Ms. Li later supplemented this whistleblower complaint with a February 17, 2016 letter to CFTC attorney James Garcia that provided additional evidentiary support for the conduct described in the June 26, 2015 whistleblower complaint. Li Dec., at ¶ 47.

**B.  Ms. Li Suffered Through Injustices and Exploitation at Tanius**

Tanius hired Ms. Li based on her expertise in trading Eurodollar futures and promised compensation and benefits commensurate with this expertise in her February 1, 2013 Employment Agreement. Jt. St. (Dkt. No. 46), at at ¶ 9. Within the Employment Agreement, Tanius promised, among other things, to:

- Sponsor Li in obtaining a green card; and

- Pay Li a monthly salary of at least $6,667 dollars; and

- Pay Li a monthly stipend of $3,333.33 for six months following her termination from Tanius. Li Dec., at ¶ 12.

In addition, Tanius, through Middlemiss, twice promised to increase Ms. Li's contingent compensation from 20-30% of net trading profits—variable based on cumulative profits already earned—to 50% of net trading profits. Li Dec., at ¶ 17. This 50% figure is in line with the compensation earned by other high-performing traders in this industry, including a fellow Tanius co-worker who is a white, male, United States citizen. *Id*. Unfortunately for Ms. Li, Tanius never actually fulfilled these promises, instead using her dependency on the H-2B visa and familial obligation to care for her grandfather in China to avoid fulfilling these promises. *Id*.

Beyond broken promises that left Ms. Li unable to trust her employer, she experienced a plethora of other injustices and exploitations while working at Tanius. *See* Li Dec., at ¶ 19. As a non-exhaustive list, Tanius caused Ms. Li to suffer by:

- Never paying her Social Security or Medicare taxes;

- Forcing her to pay for a portion of her H-1B and H-2B visa applications;

- Refusing to provide her with her W-2 for wages earned during 2015, despite repeated inquiry from her attorney;

LI'S MPA ISO OPPOSITION TO MSJ
No. 1:15-CV-05839

- Shorting her compensation without cause or explanation;

- Withholding from her compensation earned prior to her termination;

- Requiring her, alone among the Tanius traders, to sign contracts that assessed fines for risk and margin-based violations, ultimately causing her to receive $0 in compensation for September 2014; and

- Threatening her with her immigration status. *See* Li Dec., at ¶ 19, fns. 12-18.

Ms. Li calculated that, based on the conduct outlined above, Tanius owed her approximately $360,000 at the time of her termination. *See* Li Dec., at ¶ 39.

This type of behavior has continued even through the CME's investigation into the trading activities at issue in this litigation. *See* Li Dec., at ¶ 23. Middlemiss, in his June 9, 2015 interview with the CME, made several statements that appear to be contradicted not only by Ms. Li's experience as a Tanius trader but also by documents produced by Tanius in this litigation. *See* Li Dec., at ¶ 23, fns. 19-22.

### C. The Trading at Issue

As stated in the Joint Statement, Ms. Li executed money pass transactions designed to move money between Middlemiss' personal trading account, to the trading account controlled by Kering. *See* Jt. St. (Dkt. No. 46), at ¶¶ 50-69.

Ms. Li executed these trades with the sincere but misguided belief that they were the only way to recover the money that Tanius owed her. *See* Li Dec., at ¶ 38. Afraid and intimidated, she believed that any alternative method of recovering this money would be ineffective or lead to reprisals. *See id.* She feared for her immigration status, her career, and her well-being. *See id.*

Ms. Li had no plans to execute these trades until she reached a breaking point after years of the treatment described in Section II.B., *supra*, in March 2015, when Li did not receive her monthly base salary for February and realized she would never receive the 50% of net profits she had been promised. *See* Li Dec., at ¶ 38. Even then, she did not use another trader's subaccount to execute those trades even though she had access to other traders' subaccounts. *See id.*, at ¶ 40.

Ms. Li did not receive any training in CME rules and regulations during her time as a trader. *See id.*, at ¶ 41. She did not realize the gravity of her actions when she executed these trades. *See id.* When she executed the trades described in paragraphs 50 through 69 of the Joint Statement, she did so with the intent of minimizing her impact on other participants in the market. *See id.*, at 40.

Ms. Li deeply regrets her actions. *See id.*, at 42. If given the opportunity to work as a trader on the CME again, she will never engage in this type of conduct ever again. *See id.* She was driven to this—the first and only legal violation of her life—by adverse circumstances she is unlikely to face in the future. *See id.*

### D. Post-Trading Issues

Ms. Li returned to China on May 6, 2016. *See* Li Dec., at ¶ 43. She feared reprisal from Middlemiss. *See id.* Regardless, she still accepted service for this litigation while in China, where she could have easily ignored it. *See id.* She still voluntarily participated in an interview with the CME on July 1, 2015. *See id.* And she has continued to cooperate with the CME and CFTC to the best of her abilities. *See id.*

As she has been enjoined from trading during the pendency of this action, Ms. Li has been unable to practice her profession as a trader. *See id*, at ¶ 44. In addition, Ms. Li has not been able to find an alternate source of employment. *See id.*, at ¶ 45. She has been forced to exhaust her savings and to borrow money for living expenses during the pendency of this action. *See id.* Accordingly, she is financially unable to pay the civil penalty the CFTC seeks in its Motion for Summary Judgment due to her negative net worth. *See id.*, at ¶ 46.

## III. ARGUMENT

### A. Legal Standard

Summary judgment is proper only if the moving party establishes "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it

believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992)). "In such a case, the moving party 'must establish beyond peradventure *all* of the essential elements of its claim or defense to warrant judgment in [its] favor.'" *Ctr. for Biological Diversity v. Abraham*, 218 F. Supp. 2d 1143, 1153-54 (N.D. Cal. 2002) (citation omitted); *see also Indianapolis Minority Contractors Ass'n v. Wiley*, No. IP 94-1175-C-T/G, 1998 WL 1988826, at *31 (S.D. Ind. May 13, 1998) (same). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601 (citation omitted).

"A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance." *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011). All reasonable inferences are to be drawn in the "light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

A district court "may only consider admissible evidence when ruling on a motion for summary judgment." *Univ. Healthsystem Consortium v. UnitedHealth Group, Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) (citing *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009)). Accordingly, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

### B. The CFTC's Section 4b Claim Fails

The CFTC is not entitled to summary judgment in connection with its claim under Sections 4b(a)(1)(A) and (C) (together, "Section 4b") of the CEA, because it is both factually unsupported and legally improper. First, the CFTC cannot premise liability on Section 4b based on its unfounded allegation that Ms. Li was not authorized to execute trades. The CFTC cites *Meyers v. CFTC*, No. 92-70594, 1994 WL 362727, at *3 (9th Cir. July 13, 1994), for the

unremarkable proposition that "[u]nauthorized trading is generally deemed to be a violation of the anti-fraud provisions of the [CEA]." Motion, at 9. But the CFTC neglects to share that unauthorized trading cases "often arise in situations . . . where a broker takes orders from a third party who professes to be an agent of a customer." *See Meyers*, 1994 WL 362727, at *3. That is not the case here.

Tellingly, the CFTC does not even attempt to show that Ms. Li was unauthorized to execute trades on behalf of her employer. Motion, at 8-9. Nor could it. The indisputable fact remains that the trading of Eurodollar futures was one of Ms. Li's express responsibilities at Tanius. *See* Li Dec., at ¶¶ 24-25. At no point during her tenure there was Ms. Li required to secure approval prior to executing a trade. *See id.*, at ¶ 25. Because there is a genuine dispute of material fact as to whether Ms. Li was authorized to trade in Eurodollar futures, summary judgment is improper.

Second, the CFTC's Section 4b claim runs afoul of fundamental canons of statutory interpretation. The gravamen of the CFTC's case is that Ms. Li "traded her employer's account in order to move approximately $300,000 to [] Kering Capital," thereby engaging in a "'money pass' between the two accounts in favor of the Kering Capital account." Complaint (Dkt. No. 1), at 1. Based on this conduct, the CFTC brings claims under two separate provisions of the CEA: Sections 4b and 4c(a). The former constitutes the general anti-fraud provision of the CEA, making it unlawful to: (A) "cheat or defraud or attempt to cheat or defraud the other person"; or (C) "willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract . . . ." 7 U.S.C. § 6b(a)(1)(A), (C). By contrast, the latter specifically proscribes, among other things, the same conduct at issue here—Section 4c(a) makes it unlawful to engage in a "fictitious sale," otherwise known as a "money pass." 7 U.S.C. § 6c(a)(2)(A)(ii) (making it unlawful to enter into a "fictitious sale"); Complaint (Dkt. No. 1), at 9 ("Li violated Section 4c(a) of the [CEA] . . . by entering into a transaction that is of the character of, or is commonly known to the trade as *a fictitious sale*, *specifically a money pass* . . . .") (emphasis added).

Courts in this District recognize that "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Sterk v. Redbox Automated Retail, LLC*, No. 11 C 1729, 2012 WL 3006674, at *3 (N.D. Ill. July 23, 2012) (citation omitted) (also noting that "a specific statute takes precedence over a more general statute"); *see also Puffer v. Allstate Ins. Co.*, 614 F. Supp. 2d 905, 910 (7th Cir. 2009) (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 50 U.S. 461, 489 n.13 (2004)). Invoking this doctrine, the Seventh Circuit has affirmed the dismissal of claims that would render other provisions of the same statute superfluous. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1178 (7th Cir. 2013) ("Because we do not construe regulations in such a way as to render other provisions of the regulations meaningless or superfluous, [the plaintiff's] claim fails as a matter of law."); *Brumfield v. City of Chicago*, 735 F.3d 619, 628 (7th Cir. 2013) (holding that "Title II is clearly inapplicable to employment discrimination because Title I specifically, comprehensively, and exclusively addresses disability discrimination in employment"); *see also Marx v. Gen. Rev. Corp.*, __ U.S. __, 133 S. Ct. 1166, 1170, 185 L. Ed. 2d 242 (2013) ("The canon of surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Likewise, here, the CFTC's Section 4b claim is entirely duplicative of its claim under Section 4c(a), and predicated on precisely the same conduct. Complaint (Dkt. No. 1), at ¶¶ 30-39. Thus, under established Seventh Circuit precedent, the CFTC's Section 4b claim must fail because it would render Section 4c(a) superfluous. *See Sterk*, 2012 WL 3006674, at *3; *Scherr*, 703 F.3d, at 1178.

This conclusion is borne out by the claims asserted in CFTC actions involving similar allegations. In case after case in which defendants allegedly engaged in fictitious sale or money pass transactions, the CFTC has declined to bring claims under Section 4b. *See, e.g.*, *CFTC v. Supama Int'l DMCC*, No. 07 CV 2770 (RJH) (S.D.N.Y. April 8, 2008), Dkt. No. 37, at *4-*5 (establishing Section 4c(a) violation based on money pass transaction); *CFTC v. Song*, No. 10

LI'S MPA ISO OPPOSITION TO MSJ
No. 1:15-CV-05839

Civ. 2931 (NRB) (S.D.N.Y. April 11, 2011), Dkt. No. 31, at *10 (fictitious sale transactions established Section 4c(a) violation); *In the Matter of Zhang*, CFTC Dkt. No. 14-33, Order dated Sept. 29, 2014, at *4 (fictitious sales violated Section 4c(a)); *In the Matter of FirstRand Bank, Ltd.*, CFTC Dkt. No. 14-23, Order dated Aug. 27, 2014, at *3 (same).[1]  Thus, the "money pass" transaction does not support liability under Section 4b, and summary judgment is therefore improper.

### C.     The $901,387.50 Civil Penalty Sought By The CFTC Bears No Rational Relationship to Ms. Li's Alleged Violations

Section 6c(d)(1)(A) of the CEA, 7 U.S.C. § 13a-1(d)(1)(A), provides that the Court, upon a proper showing, may impose a civil monetary penalty in an amount that does not exceed the higher of the applicable statutory maximum or triple the monetary gain for each violation.  CFTC regulations provide that $140,000 is the maximum for violations committed on or after October 23, 2008.  *See* 17 C.F.R. § 143.8(a)(1)(ii) (2012).

Civil penalties should be imposed to act as a deterrent, but should be proportional to the gravity of the offenses committed.  *See CFTC v. Brockbank*, 505 F. Supp. 2d 1169, 1177 (D. Utah 2007).  Although the CEA gives courts broad discretion in calculating a civil monetary penalty, the penalty imposed must be rationally related to the violation.  *See CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008); *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 177 (5th Cir. 2000).

In setting the fine, the Court must consider a number of factors, including (i) the seriousness of the violations as determined by the relationship of the violation to the regulatory purpose; (ii) whether the violation was an isolated mistake arising from an ambiguous statutory duty or from circumstances that are unique or unforeseeable; (iii) the particular mitigating and aggravating circumstances presented by the unique facts of the conduct at issue; (iv) any benefit to the violator; (v) any harm to the investors; (vi) any attempt to cure the violations; (vii) post-

---

[1] For the Court's convenience, all CFTC Orders cited in this Opposition are attached to the Morgan Declaration.

violation conduct; (viii) cooperation with authorities; and (ix) any attempt to provide restitution. *See id.* The Court may also look to penalties assessed in analogous cases in determining the size of the civil penalty here. *See Monieson v. CFTC*, 996 F.2d 852, 864 (7th Cir. 1993) (stating that $500,000 civil penalty was most troubling because "it far exceeds fines levied in analogous cases."). These factors, on balance, weigh in favor of the Court assessing no penalty, or a minimal penalty, against Ms Li.

### 1.    The Relationship of the Alleged Violations to the Regulatory Purpose Does Not Support the Requested Civil Penalty

With respect to the first *Levy* factor, the seriousness of a violation derives primarily from its relationship to the various regulatory purposes of the CEA. Conduct that violates core provisions of the CEA—manipulating prices or defrauding customers, for example—should be considered serious. *See CFTC v. Noble Wealth*, 90 F. Supp. 2d 676, 694 (D. Md. 2000) (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995)). "Customer fraud is a violation of the core provisions of the [CEA] . . . [w]here the losses or gains in a customer fraud case are substantial, so have been the civil penalties." *Id.* (quoting *In re Slusser*, 1999 CFTC LEXIS 167, Comm. Fut. L. Rep. ¶ 27,701 (CFTC July 19, 1999)).

Here, a smaller penalty is appropriate because, as discussed above, Ms. Li's conduct, at worst, involved money pass transactions and not price manipulation or fraud and therefore does not implicate the core provisions of the CEA. Congress enacted the CEA because of its concern over "pervasive fraud in the commodity option industry." *CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1152 & n.3 (S.D.N.Y. 1979). Judgments and orders in prior CFTC actions distinguish between money pass violations and fraud and impose lighter penalties for money pass conduct. In a case from this district, *CFTC v. Singhal,* Case No. 12-cv-00138 (N.D. Ill.) (St. Eve, J.), defendant Deepak Singhal was charged under Section 4c(a) of the CEA for arranging trades between his trading account and an account he opened in his mother's name to trade foreign currency options in ten separate transactions in December 2010. *See Singhal*, Dkt. 32, at 5-7. In doing so, Singhal transferred at least $118,868.75 from his account to his mother's

account.  *See Singhal*, Dkt. 32, at 14.  With his consent, the court entered an order that, among

other things, imposed a one-time civil penalty of $140,000 against Singhal and directed him to

pay $118,868.75 in disgorgement.  In two separate cases, the Southern District of New York

imposed civil penalties of $100,000 and $140,000 against traders who engaged in money pass

transactions.  *See CFTC v. Supama Int'l DMCC*, Case No. 07 CV 2770 (S.D.N.Y.), Dkt. No. 37,

at 4, 6; *CFTC v. Song*, Case No. 10 civ 2931 (S.D.N.Y. Apr. 11, 2011), Dkt. No. 31, at 9, 14. [2]

And in a CFTC administrative proceeding, *In the Matter of Fan Zhang*, CFTC Docket No. 14-

33, respondent was charged under Section 4c(a) of the CEA for "intentionally engag[ing] in

prearranged trades for the purposes of directly transferring money into his mother's trading

account without her knowledge."  *See Zhang*, at 2.  Zhang executed the trades on four days over

a three-month period, which transferred over $200,000 in proceeds to his mother.  *See Zhang*, at

2.  With his consent, the CFTC entered an order that, among other things, imposed a civil penalty

of $250,000, but did not require Zhang to pay any disgorgement.[3]  *See Zhang*, at 6.

By contrast, many of the judicial decisions that impose a substantial penalty for "serious"

violations do so based on findings that the underlying conduct involved price manipulation or

some type of customer fraud, which are not present here.  *See, e.g.*, *CFTC v. PMC Strategy, LLC*,

903 F. Supp. 2d 368 (W.D.N.C. 2012) (imposing penalties of $420,000 and $560,000 against

individual and company, respectively, for fraudulent solicitation and misappropriation of

customer funds); *CFTC v. Cloud*, Civil Action No. H–10–706, 2011 WL 1157530 (S.D. Tex.

Mar. 24, 2011) (unpublished) (imposing $5 million penalty where defendants defrauded 37

customers); *CFTC v. Capitalstreet Fin., LLC*, No. 3:09–cv–387–RJC–DCK, 2012 WL 79758

(W.D.N.C. Jan. 11, 2012) (unpublished) (imposing penalty of $3.1 million where defendant

defrauded 97 victims out of $1 million); *Brockbank*, 505 F. Supp. 2d at 1169 (imposing penalties

of $1.1 million against defendants who defrauded investors).

---

[2] *Singhal* and *Song* are the only two CFTC enforcement actions using the term "money pass" that counsel for Ms. Li
could locate in the Westlaw database.
[3] The size of Zhang's civil penalty was likely also influenced by his refusal to cooperate with the CFTC's
investigation, despite being presented with numerous opportunities to do so.  *See Zhang*, at 3.

Ms. Li's conduct here is directly analogous to the money pass cases, rather than the more serious fraud cases. CFTC argues that the requested penalty, which represents triple Defendants' alleged monetary gain of $300,462.50, is justified because of the repeated and knowing violations of the CEA. But she did not undertake the trades to engage in price manipulation or fraud, the core harms the CEA was intended to address. Indeed, Ms. Li did not understand at the time that the trades at issue were wrongful. *See* Li Dec., at ¶ 41. A three-time increase over the alleged gain is excessive in light of the *Singhal*, *Supama*, and *Zhang* cases. Each of these cases supports a penalty far less than the $900,000 penalty that the CFTC has requested. Each of these cases involves conduct nearly identical to Ms. Li's trading here (without the mitigating factors of her hostile work environment). And in each of these cases defendant or respondent paid no more than a one-time civil penalty, or in the case of Zhang, who did not pay any disgorgement, a penalty that roughly equaled the amount of trading profits. As such, Ms. Li's violations are not so serious as to warrant the extraordinary penalty that the CFTC requests.

Moreover, despite the CFTC's arguments, these trades were not knowing, but rather the result of Ms. Li's temporary lapse in judgment. As discussed in greater depth above in the statement of facts and below, the charged trading was the product of a hostile work environment in which Ms. Li suffered, among other things, threats of deportation and unpaid compensation. *See* Li Dec., at ¶¶ 10-19. These trades were an isolated mistake that Ms. Li now understands were wrongful. *See id.*, at ¶ 42. Indeed, her conduct only harmed one person and, if Ms. Li is found liable for any violation, Middlemiss will receive restitution.

## 2. The Trading Arose From Unique Circumstances, Which Present Particular Mitigating and Aggravating Factors

Under the second and third *Levy* factors, the Court must consider whether Defendants' violation was an isolated mistake arising from an ambiguous statutory duty or from circumstances that are unique or unforeseeable and the particular mitigating and aggravating circumstances presented by the unique facts of the conduct at issue. In this case, these two factors support a finding that the Court should impose no, or a limited, penalty against Ms. Li.

LI'S MPA ISO OPPOSITION TO MSJ
No. 1:15-CV-05839

While employed by Tanius, Ms. Li was subjected to a hostile work environment, which spurred her to engage in the trading at issue. *See* Li Dec., at ¶¶ 38, 43. During her two-plus years working for Tanius, Ms. Li was subjected to repeated threats of deportations, non-payment of earned compensation, discrimination based on her national origin, and unfulfilled promises made by Middlemiss and Tanius. *See id.*, at ¶¶ 10-19. In particular, Tanius and Middlemiss failed to pay Social Security and Medicare taxes for her, required Ms. Li to pay fees related to her H-1B and H-2B visa applications (which violated federal immigration laws), never delivered on their promise to sponsor her and apply for a green card, failed to pay her final wages, failed to provide her with a W-2 for 2015, and paid at least one white male trader a higher percentage of trading profits. *See id.*

In addition, Ms. Li discovered that Tanius and Middlemiss were defrauding the CME. She learned that the firm operated under an individual membership in Middlemiss' name to trade on the CME rather than a corporate membership in Tanius's name. *See id.*, at ¶ 21, Ex. G at Interrogatory No. 18. This improper arrangement saved Tanius over $5 million in transaction fees. But Ms. Li did not feel secure enough to report this fraudulent practice internally because she feared that Middlemiss would retaliate against her by executing on one of the several threats he had already made to her. Instead, prior to the commencement of this action, Ms. Li filed a whistleblower complaint with the CFTC. *See id.*, at ¶ 47.

Despite her mistreatment, Ms. Li generated significant profits for Tanius during her time there. Often working sixteen-hour days, including weekends and holidays, Ms. Li generated net profits of over $3.6 million for Tanius. *See id.*, at ¶¶ 2, 9. This total was higher than the profits generated by any other trader at Tanius. *See id.*, at ¶ 3, Ex. A at TAN 20151211 E-422 through 425.

However, after two years of near constant mistreatment, Ms. Li finally hit her breaking point. *See id.*, at ¶ 38. Using Middlemiss' personal trading account, the one he used to obtain lower CME transaction fees, Ms. Li engaged in the trading at-issue "as a result of the fear and intimidation she felt in her work environment." Jt. St. (Dkt. No. 46), at ¶ 76. She believed that

"executing these trades was the only way in which she would receive the compensation that she believed Tanius owed to her." *Id*. Because Ms. Li did not receive any training on CME rules and regulations during her time at Tanius, she did not know at the time that the trading she engaged in violated CME rules and regulations. *See* Li Dec., at ¶ 41. Nonetheless, she arranged the trading in such a way as to minimize the impact of the trades on the market and investors. *See* Li Dec., at ¶ 40; *see also* Jt. St. (Dkt. No. 46), at ¶¶ 56-57, 59-61.

### 3. Ms. Li Did Not Benefit From The Trading

The fourth *Levy* factor also favors no, or a limited, penalty against Ms. Li because the proceeds of the trades at issue went to Kering. Because she used Kering's trading accounts, the proceeds of the trades went directly to Kering, not her. But as a result of the asset freeze entered in this action, those proceeds have been frozen in Kering's account during the pendency of this case. Ms. Li never received the proceeds of the trades that she made. At no point since Ms. Li made the trades in question has she had the benefit of the trading proceeds.

Moreover, even if the Court determines that Ms. Li did somehow obtain a benefit from the funds in Kering's trading account, those funds represented monies that Ms. Li believed were owed to her by Tanius and Middlemiss. *See* Li Dec., at ¶ 39. Middlemiss made multiple promises to Ms. Li regarding her compensation and he failed to honor those promises. *See id.*, at ¶ 10-19. By her calculation, Middlemiss and Tanius owed her at least $360,000 in unpaid compensation and benefits. *See id.*, at ¶ 39.

### 4. Ms. Li Did Not Harm the Market or Investors

The fifth *Levy* factor weighs in favor of no, or a limited, penalty against Ms. Li because she did not harm any investors. Ms. Li planned the trades at issue in such a manner as to avoid any market or investor impact. *See* Li Dec., at ¶ 40. Indeed, the trades were conducted after hours so that she could ensure that she controlled both sides of the transaction. Li traded after regular CME trading hours on five different evenings from March through May 2015. *See* Jt. St. (Dkt. No. 46), at ¶ 55. On each of these trading days, Li used the Kering account to place a Eurodollar spread order and then placed a second order through the Tanius account on the

opposite side of the market for the same product, quantity, and price. *See id.*, at ¶¶ 56, 59. Once Li matched the orders, she would enter equal and offsetting transactions to close out the position. *See id.*, at ¶¶ 57, 60. By trading in this manner, Li ensured that she did not trade with any other counterparty, eliminating any impact to investors or the market. *See id.*, at ¶ 61; Li Dec., at ¶ 40. Indeed, the CFTC concedes that Li's manner of trading "meant there would be fewer market participants trading, and she would have a better chance of matching the orders." Mot. at 10. Moreover, the CFTC also acknowledges that Li "concentrated her trading on CME Globex Eurodollar contracts with expiration dates that were five or more years beyond the trade date, which generally have less trading activity," increasing the "likelihood of matching those orders." Mot. at 10.

Independent trading analysis from an economics and finance consultant confirms the lack of market or investor impact. *See* Declaration of Tiago Duarte-Silva ("Duarte-Silva Dec."), at ¶¶ 5-8. Dr. Duarte-Silva, after reviewing the trades in question, determined that Ms. Li's bids and offers posted on CME Globex remained open on average for 1 hour and 26 minutes, with some open for several hours, "and could therefore have been matched by other market participants" but were not. *See* Duarte-Silva Dec., at ¶ 6. In addition, he found that the CFTC's finding that the Kering and Middlemiss accounts "were the only two accounts trading in the particular spread markets" "supports the notion that [Ms.] Li's trading did not impact any investors' orders during those periods." *Id.*, at ¶ 7. And, Dr. Silva determined that the CFTC's assertion that Ms. Li "traded outside of regular CME trading hours, which meant there would be fewer market participants trading" "supports the notion that the impact of [Ms.] Li's trading on the market's price discovery process was minor, if any." *Id.*, at ¶ 8.

### 5. Ms. Li's Cooperation and Other Post-Violation Conduct Weigh in Favor of no Penalty

Under the seventh and eighth *Levy* factors, the Court should evaluate Ms. Li's cooperation with the CFTC and her post-violation conduct. Both factors support a finding of no, or a limited, penalty.

Ms. Li has made every effort to cooperate with the CFTC and CME in connection with the investigation and litigation of this action. She voluntarily agreed to sit for interviews with the CME on July 1, 2015. *See* Li Dec., at ¶ 43. Moreover, Ms. Li filed her whistleblower complaint, providing evidence of fraud by her employer, less than one week before she was scheduled to appear for her interview with the CME. *See id.*, at ¶ 47. She did so despite the risk of facing additional questions regarding her involvement and any role she may have had in Middlemiss' fraud on the CME. Her willingness to cooperate with the CFTC has not declined even though she relocated to China in May 2015. *See id.*, at ¶ 43.

Ms. Li's post filing conduct also supports no penalty. Ms. Li agreed to voluntarily accept service of process in this action, despite living in China since before the filing of this complaint. *See id.*, at ¶ 43. In doing so, she willingly subjected herself to this Court's jurisdiction, even though she understood that the CFTC likely would not be able to serve her successfully in China if Ms. Li simply chose to ignore the lawsuit. Also, even though her inability to obtain alternate employment creates a significant incentive for her to utilize her trading skills and violate the preliminary injunction from China, Ms. Li has complied with the terms of the injunction and not engaged in any trading since this action was filed. *See id.*, at ¶¶ 44-45.

### 6. Ms. Li Could Not Cure the Violations or Provide Restitution

Under the sixth and ninth *Levy* factors, the Court must look to Ms. Li's attempts to cure the violations and her efforts to provide restitution. Here, the entry of the injunction and the asset freeze over Kering's trading account, where the proceeds of the trading in question are held, has prevented Ms. Li from curing the violations and providing restitution to Tanius. She has no objection to Kering returning the proceeds to Tanius or Middlemiss. *See* Li Dec., at ¶ 34. Because her trading did not harm the market or investors, restitution is the only means by which she can cure the violations. Moreover, the frozen funds are the only means by which Ms. Li could presently provide restitution. She currently lacks the financial means to return the $300,000 to Middlemiss separate and apart from the funds held in Kering's frozen account. *See id.*, at ¶ 46. She has been unable to find alternate employment since the filing of this action and

only has a net worth of approximately -$28,000. *See id.*, at ¶¶ 45-46.

**D.  An Injunction Permanently Enjoining Ms. Li From Futures Trading and Future Violations is Not Necessary or Warranted**

The CFTC seeks an injunction that permanently bars Ms. Li from trading in the futures market and from future violations of the CEA. An order permanently enjoining Ms. Li from future violations of the CEA is not appropriate here. As the CFTC notes, it is entitled to obtain an injunction upon a showing that a violation has occurred and that there is a reasonable likelihood of future violations. As discussed above in Section III.A, *supra*, the CFTC cannot show that a violation of the CEA's antifraud provisions has occurred.

With respect to future violations, the CFTC bears the burden of showing a reasonable likelihood of future violations. As the CFTC acknowledges, the Court must examine the totality of the circumstances, including "whether there is any indication that previous violations were an isolated occurrence." Mot., at 16. In addition, the Court can also consider (1) the egregiousness of Ms. Li's actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of Ms. Li's assurances against future violations, (5) Ms. Li's recognition of the wrongful nature of her conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations. *See* Mot., at 16.

Here, the CFTC cannot satisfy its burden to show that there is a reasonable likelihood of future violations under these factors. First, the trades were not egregious in light of the isolated impact of the trades; there was no market or investor impact. Second, the record demonstrates that Ms. Li's trading was a unique and isolated occurrence fueled by her hostile work environment and her frustration with her mistreatment. Other than the handful of trades that Ms. Li made after suffering over two years of mistreatment, the CFTC has provided no evidence that she engaged in any other misconduct. Third, Ms. Li did not commit the violations with scienter because she failed to appreciate, at the time, that her trading was wrongful. Fourth, Ms. Li has confirmed that she "will never engage in this type of conduct ever again." Li Dec., at ¶ 42. The Court can accept the sincerity of Ms. Li's statement because she now recognizes that the trades

were wrongful and she is willing repay Tanius with the funds currently frozen in Kering's trading account.  And the CFTC has offered no evidence that can refute Ms. Li's statement. Fifth, Ms. Li is not presently employed and she does not have an opportunity to engage in future violations.  But even if she had the ability to trade again in the future, all of the other factors point to a finding that she is not likely to commit future violations.  This action has provided the necessary deterrence to Ms. Li to avoid any future violations.

The only evidence that the CFTC relies upon to meet its burden to show a reasonable likelihood of future violations are unrelated trades that Ms. Li performed on behalf of four individuals *none of which involved commodities, futures, or any financial instrument addressed by the CEA.  See* Mot., at 18.  These investors provided Ms. Li with $450,000 and authorized her to trade on their behalf.  The CFTC concludes that because Ms. Li deposited these funds into a trading account in her mother's name and used her mother's trading ID, Ms. Li intended to trade "surreptitiously."  Mot., at 18.  However, this conclusion fails to take into account the fact that Ms. Li, who by her own admission was not familiar with CME rules and regulations, was trading on behalf of Tanius in an account that also was not in her name.  Because Ms. Li believed, at least initially, it was appropriate for her to trade under an individual's personal account, any inference created by her trading for the four investors should be viewed innocently, rather than as an intentional effort to hide her trading, as the CFTC has argued.  Ms. Li returned the funds to the investors in May 2015, well before the filing on this action in July 2015.[4]  *See* Li Dec., ¶ 21, Ex. G at Interrogatory No. 3.  As a result, the CFTC cannot meet its burden to show that there is a reasonable likelihood that Ms. Li will commit future violations of the CEA, rendering unnecessary and unwarranted a permanent injunction prohibiting trading in the futures market and future violations of the CEA.

---

[4] The CFTC also attempts to make hay out of the fact that Ms. Li failed to return the last $50,000 to the four investors, even though she did return the other $400,000.  *See* Mot., at 18. Li intends to return the funds, and has held an amount of stocks in the trading account equivalent to the funds remaining of that $50,000 so that she can return it to the investor.  *See* Li Dec., at ¶ 36. Ms. Li has no intention of keeping the funds for herself, as the CTFC appears to imply.

　　　　　　LI'S MPA ISO OPPOSITION TO MSJ
　　　　　　　　　　　　　　　　No. 1:15-CV-05839

Moreover, no permanent trading ban was imposed in other money pass or "fictitious sales" cases under Section 4c. For example, the complete absence of trading bans regularly appears in the "fictitious sales" cases. *See In the Matter of Benjamin Hutchen*, Docket No. 13-07, Order dated Nov. 27. 2012, Dkt. No. 32, at 7-8; *In the Matter of Pak Tong Lui a/k/a/ Patrick Lui*, Docket No. 07-06, Order dated April 25, 2007, Dkt. No. 37, at 5-7. In *Supama*, the Southern District of New York did not impose a trading ban on the firm whose employee engaged in the money pass transaction. *See Supama*, Dkt. No. 37, at 5-6. In *Singhal*, this district declined to impose a permanent trading ban in a money pass case on the trader defendant. *See Singhal*, Dkt. No. 32, at 16 (imposing five-year trading ban). And in the *Zhang* administrative proceeding, the CFTC declined to impose a permanent trading ban and only imposed a five-year trading ban in light of the respondent's complete lack of cooperation. *See Zhang*, at 8.

## IV. CONCLUSION

For the foregoing reasons, Ms. Li respectfully requests that the Court deny Plaintiff CFTC's Motion for Summary Judgment and the relief requested therein.

Dated: July 1, 2016                 **ZACCARO MORGAN LLP**

By: /s/ Nicolas Morgan
        Nicolas Morgan (admitted *pro hac vice*)
        *Attorneys for Defendant Yumin Li*