| | | |
|---|---|---|
| U.S. COMMODITY FUTURES | ) | |
| TRADING COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 5839 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| YUMIN LI, and | ) | |
| KERING CAPITAL LTD. | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KERING CAPITAL LTD. | ) | |
| | ) | |
| Relief Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC") filed a complaint

against Defendants Yumin Li and Kering Capital, Ltd. ("Kering"), alleging that Li and Kering

violated the Commodity Exchange Act (" the Act"), 7 U.S.C. §§ 6b(a)(1)(A) and (C), 7 U.S.C.

§ 6c(a), and 17 C.F.R. § 1.38(a), when Li cheated or defrauded Li's employer, Tanius

Technology ("Tanius"), by entering into pre-arranged, fictitious trades of futures contracts

designed to  transfer money from Tanius to Kering.  CFTC now moves for summary judgment,

seeking to permanently enjoin Defendants from further violations of the Act, permanently enjoin

Li from trading in the futures markets, and permanently enjoin Kering from granting Li access to

its futures trading accounts and from relying upon Li for trading advice and direction.  CFTC

also asks the Court to impose a civil monetary penalty of $901,387.50, jointly and severally

against the Defendants.  Finally, CFTC requests that the Court order restitution to Tanius in the

amount of $300,462.50, plus post-judgment interest.

Because the undisputed facts establish that Li engaged in illegal fictitious trades in order to fraudulently transfer funds from Tanius to Kering and did so in the scope of her employment with Kering, the Court grants the CFTC's motion for summary judgment. The Court orders Li and Kering to return $300,462.50, plus post-judgment interest, to the Tanius Account and to pay a civil penalty of $901,387.50. The Court enjoins Li from working in the futures markets for five years and permanently enjoins Li from future violations of the Act. The Court enjoins Kering from employing Li to do any work related to the futures markets for five years and permanently enjoins Kering from future violations of the Act.

CFTC also moves to strike [65] the declaration of Nicolas Morgan in opposition to the motion for summary judgment [56], the declaration of Dr. Tiago Duarte-Silva [57], and Li's Response to the Joint Statement of Undisputed Material Facts[1] [58]. Li subsequently withdrew the declaration of Dr. Duarte-Silva, but she continues to object to the exclusion of her Response and the Morgan declaration. Because the Response does not comply with the Court's standing order on summary judgment procedures and the Morgan declaration puts forth irrelevant and inadmissible evidence, the Court grants CFTC's motion to strike.

## BACKGROUND[2]

### A.    Relevant Parties

#### 1.    *Yumin Li*

Tanius, a California based trading firm, employed Li from February 2013 until May 2015. Tanius hired Li because she had expertise in Eurodollar and other types of trading. While employed at Tanius, Li received a total of $931,140.21. According to her employment

---

[1] Li filed an amended Response to the Joint Statement of Undisputed Material Facts [72]. The Court treats the motion to strike as applicable to this amended Response.

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts ("JSOF"), Doc. 46. All facts are taken in the light most favorable to Li and Kering Capital, the non-movants.

agreement, Li was not authorized to trade any securities or financial instruments for herself or any other entity without authorization from Tanius.

Li contends that while at Tanius, she was treated unfairly relating to the margin and risk limits on her trading activities. Li also felt that Tanius did not appropriately compensate her and thus, she faciliated the trades described below in order to obtain compensation which she believed Tanius owed to her.

Li accepted a position as a trader at Kering in November 2014 while still employed at Tanius. At Kering, Li was the only person trading futures for Kering and held sole responsibility for developing Kering's futures trading strategies.

Prior to her employment at Tanius, Li had worked periodically as a Eurodollar trader for five years. Li has a master's degree in statistics and a bachelor's degree in business administration.

### 2.     *Kering Capital Limited*

Kering is a company incorporated in the British Virgin Islands. Yanping Lu, Li's mother, formed Kering in November 2014. Lu is the Chief Executive Officer of Kering. Kering's sole business activity is trading; its only business asset is the trading account ending in 2536 ("Kering Account"). During the relevant timeframe, Li was a probationary trader for Kering, but she expected to receive compensation from Kering for profitable trading and she expected to be hired by Kering if she generated enough profit.

### 3.     *Tanius Technology LLC*

Tanius is a California-based trading firm. One of Tanius' founders, Gary Middlemiss, was Li's supervisor at Tanius. While working at Tanius, Li had access to Middlemiss' trading account ending in 8202 ("Tanius Account").

**B.      Trading at Issue**

Beginning on March 17, 2015 and continuing until May 6, 2015, Li used the Tanius Account to engineer a series of trades designed to benefit Kering.  Li structured 41 trades over six separate occasions such that the Tanius Account would always buy futures from the Kering Account at higher prices and sell those same futures back to Kering at lower prices (or in the reverse order in some circumstances) completing what is known as a "round-turn trade." Regardless of the order of the transaction, each transaction resulted in unidirectional profits to Kering at the expense of Tanius.  Over the course of these 41 transactions, Li successfully transferred $300,462.50 from the Tanius Account to the Kering Account.  Li was not authorized by Middlemiss or anyone else at Tanius to enter into any of these 41 transactions and she was not authorized to enter into any transactions that obviously would result in a loss for Tanius.

Li always placed these orders outside of normal trading hours in illiquid futures markets—typically Eurodollar futures with expiration dates more than five years in the future. She would enter an order with one account and then, within seconds, enter an identical order with the other account on the opposite side of the trade.  For example, on May 6, 2015, between 12:42:54 AM and 12:43:05 AM (a nine-second window), Li entered orders on the Kering Account selling a total of 2400 futures with three different expiration dates.  Then, between 12:44:17 AM and 12:44:21 AM, Li entered orders on the Tanius Account to buy the exact same quantities of those futures at the exact price she offered them on the Kering Account.  These orders matched and the exchange executed the trade.  Li then immediately closed out the position by doing essentially the same transaction in reverse, this time entering an order to buy the same 2400 futures with the Kering Account and selling them from the Tanius account, but this time at a lower price.  Again the orders matched and the exchange executed the trade.  The total time

elapsed from the moment Li entered the first order until she closed out the position was one minute and forty seconds, during which time she transferred $67,487.50 from the Tanius Account to the Kering Account. Each of the other round-turn trades Li executed between the Tanius Account and the Kering Account resulted in a loss to Tanius and a gain to Kering.

By engaging in these trades outside of regular business hours, placing nearly simultaneous orders in illiquid products, Li was able to virtually assure that she would not trade with a third party, and eliminated any market risk to her transaction. During each of her trades, the Kering Account and Tanius Account were the only two accounts trading in the selected markets.

**C.     Discovery of the Trading and Subsequent Action**

On May 6, 2015, Middlemiss noticed that trading had occurred in the Tanius Account that had caused a significant loss on the account. Middlemiss asked Li about the trades and she admitted to executing the trades. That same day, Li fled to China where she remains to this day. Li has expressed her intention to return to the United States and continue trading for Kering after the conclusion of this case.

Kering did not authorize Li to engage in illegal transactions, and Lu was not aware that Li conducted trades on behalf of Kering by controlling the Tanius Account and directing trades favoring Kering with that account.

**D.     Freezing of the Kering Account**

On July 2, 2015, the Court entered an order freezing the assets in the Kering Account. The parties consented to a preliminary injunction extending the freeze for the duration of the case on July 23, 2015.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L .Ed. 2d 202 (1986).

## ANALYSIS

### A.      Motion to Strike

CFTC moves to strike the declaration of Nicolas Morgan in opposition to the motion for summary judgment, the declaration of Dr. Tiago Duarte-Silva, and Li's Response to the JSOF.

#### 1.      *Morgan Declaration*

The declaration of Nicolas Morgan contains irrelevant information and several citations to prior CFTC decisions. CFTC does not move to strike the decision citations, only the irrelevant information contained in paragraphs 2–4 and 10. Declarations offered in support of a

motion for summary judgment must "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). The Morgan Declaration sets out the following statements that CFTC seeks to strike for presenting irrelevant information:

> 2.      I contacted counsel for Tanius on March 4, 2016 at 4:08 PM and on March 15, 2016 at 10:38 PM via email.
>
> 3.      In these two emails, I asked Tanius' counsel to confirm whether they would provide my client, Li, with her W-2 for 2015.
>
> 4.      I never received a response to either of these emails.
>
> …
>
> 10.     In addition, as part of the courtesy copy of the filing that I have provided to the Court, I have also provided a CD containing an audio recording produced by the CFTC in this action, bates-stamped as CFTC-Li-0001748. This recording is an interview conducted by the CME of Gary Middlemiss. Ms. Li relied on this recording in preparing the transcript that is attached to her concurrently-filed declaration as Exhibit I.

Doc. 56 ¶¶ 2–4, 10. In her response to the motion to strike, Li offers no argument regarding the Morgan Declaration or why it is admissible. The Court finds that the four challenged paragraphs contain irrelevant information and therefore strikes them and does not consider them in conjunction with the motion for summary judgment.

### 2.      *Li Response*

CFTC seeks to strike Li's Response to the JSOF in its entirety because it fails to comply with the Court's summary judgment procedure and because it offers inadmissible and irrelevant information.

The Court's summary judgment procedure requires all undisputed facts be included in the joint motion for undisputed facts. The additional facts Li seeks to put before the Court do not appear to be disputed, therefore they are not properly before the Court. The Court's procedures are not advisory; therefore, the Court strikes these facts. *See Sweatt v. Union Pac. R.R. Co.*, 796

F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures as conforming to Local Rule 56.1); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (district court does not abuse its discretion "when it opts to disregard facts presented in a manner that does not follow [Local Rule 56.1's] instructions").

Even if the Court considered these facts, they do not help Li's case. Li argues in her Response that the facts she presents may be considered for purposes of determining the appropriate remedy. But her Response to the JSOF does not add any information the Court finds useful even if it were admissible. For example, in the "Remedies Facts" section of her Response, Li provides the following response to paragraph 13 of the JSOF:

> 14. Although Tanius paid Li $931,140.21 during her employment at Tanius, she was still undercompensated because Tanius broke certain promises made to Li in the Employment Agreement and otherwise mistreated her in ways that required her to undertake additional expenses or receive reduced compensation.
>
> 15. In addition, Tanius broke promises made to Li to increase her net profits based contingent compensation to 50%, instead of the 20-30% outlined in the Employment Agreement, which significantly reduced Li's compensation.

Doc. 72 ¶¶ 14–15. This response is typical of Li's failure to comprehend the nature of her violation and unwillingness to accept responsibility. The fact that she had an employment dispute with her employer does not justify or mitigate the theft of over $300,000 from her employer or her abuse of the commodities market to carry out that theft. It does show, however, that she has not internalized the wrongfulness of her conduct and is likely to repeat it in the future. The remainder of her Response is in a similar vein. The Court thus strikes the Response for failure to comply with the Court's summary judgment procedures and for lack of relevance.

### 3. *Dr. Duarte-Silva Declaration*

Finally, CFTC moves to strike the declaration of Dr. Duarte-Silva. Li subsequently withdrew this declaration, therefore, the Court denies as moot CFTC's motion to strike the declaration.

## B. Liability

### 1. *Unauthorized Trading and Misappropriation Claim (Count I)*

CFTC first contends that Li committed fraud and misappropriated funds in violation of § 4b of the Act, 7 U.S.C. § 6b. CFTC claims that Li cheated or defrauded her employer, Tanius, by engaging in unauthorized trades of Eurodollar futures on behalf of Tanius, which were structured in such a way as to shift money from Tanius to Kering. A party violates § 4b if, in connection with any order to make any on-exchange futures contract for another person, the party cheats, defrauds or attempts to cheat or defraud the other person, or the party willfully deceives or attempts to deceive the other person by any means in regard to any such order or contract. 7 U.S.C. § 6b(a)(1)(A),(C).

Between March 17, 2015 and May 6, 2015, Li engaged in pre-arranged trades of Eurodollar futures contracts between accounts she controlled that were owned by Tanius and Kering. Li engaged in these trades with the sole purpose of moving money from Tanius to Kering, and she ultimately succeeded in transferring $300,462.50 from Tanius to Kering by way of these fictitious trades. These trades were designed to result in financial losses for Tanius and financial gains for Kering. Li made these trades without the knowledge or authorization of her employer, Tanius. Furthermore, while she was generally permitted to trade Eurodollar futures on Tanius' account, she was not authorized to engage in trades which were structured to create a loss for Tanius. Li undertook these trades willfully because she believed that Tanius owed her

money and that executing these trades was the only way she would receive the money she believed they owed her. This conduct establishes a violation of § 4b.

Li argues that the Court should deny the motion for summary judgment on Count I because there is a dispute as to whether she was authorized to trade Eurodollar futures. This argument falls flat, however. It is not material whether or not Li was authorized to trade Eurodollar futures as a general matter, and CFTC does not dispute that she was. The issue is whether Tanius authorized her to engage in fictitious trades designed to siphon money from Tanius to Kering. They did not. Included with the Joint Statement of Undisputed Facts is a list of all 41 improper trades Li structured on behalf of Tanius and Kering. The parties do not dispute that "Li was not authorized by Middlemiss to enter into the Eurodollar transactions identified" in that list and that she was "not authorized by Middlemiss to enter into any transaction that would obviously result in a loss."[3] Doc. 46 at ¶ 53. Her authorization to trade Eurodollars merely provided the means for her to commit this deception; it did not create immunity from liability.

Li also argues that the § 4b claim should be thrown out because the mechanism by which she engaged in the fraud, a "money pass," is prohibited by § 4c(a) of the Ac, 7 U.S.C. § 6c(a), under which CFTC is also seeking relief in this matter. Li argues that the § 4b and § 4c claims are "entirely duplicative" and therefore the enforcement of the § 4b claim would render § 4c superfluous. Doc. 55 at 9. This again is incorrect. Sections 4b and 4c are not duplicative. Section 4b prohibits taking money from another party in a deceptive manner, in relation to a

---

[3] In her Amended Response to the JSOF, Li states that she did not need to seek permission prior to conducting specific trades, that her trade restrictions were margin and position-based, and she was authorized to trade Eurodollar futures. Doc. 72 at ¶¶ 10–12. Even if the Court did not strike the Response, these assertions have no bearing on whether or not she was authorized to engage in trades designed to steal money from Tanius. If anything, they illustrate the amount of trust that Tanius put in her, which she subsequently betrayed.

futures contract, whereas § 4c prohibits fictitious trades of futures contracts whether done to commit a fraud or not. Here, Li happened to have used a money pass as the method of carrying out her fraud, but engaging in a money pass is not always a fraud nor is a fraud always a violation of § 4c. The elements of the two offenses are distinct and it is possible to violate one without the other. If, for example, Li had engaged in the money pass transactions with Middlemiss' approval, that would have been a violation of § 4c but not § 4b. Therefore, § 4b is not duplicative of § 4c.

There is no dispute that Li knowingly engaged in fictitious trades of Eurodollar futures using the Tanius account and without the knowledge or approval of her managers at Tanius in order to transfer money from Tanius to Kering. Thus, CFTC is entitled to summary judgment on the § 4b claim.

### 2. *Fictitious Sales of Eurodollar Futures (Count II)*

CFTC alleges that in the process of carrying out her misappropriation of Tanius funds, Li engaged in a series of pre-arranged, fictitious trades with the Kering Account she also controlled in violation of § 4c of the Act. 7 U.S.C. § 6c(a). Li does not contest her liability under § 4c in her Response, but this does not end the Court's inquiry; the Court still must determine whether CFTC has established that they are entitled to judgment as a matter of law. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

Section 4c makes it unlawful for any person to enter into the execution of a transaction that is a fictitious sale. 7 U.S.C. § 6c(a). A fictitious sale is one which uses pre-arranged trades that give the appearance of submitting trades to the open market but is protected from market risk and price competition. *In the Matter of Solomon Mayer*, CFTC No. 92-21, Comm. Fut. L. Rep. P 27,259, 1998 WL 39411, at *21 (Feb. 3, 1998). Pre-arranged trades are fictitious sales

because "[b]y determining trade information such as price and quantity outside the pit, then using the market mechanism to shield the private nature of the bargain from public scrutiny, both price competition and market risk are eliminated." *CFTC v. Moncada*, 31 F. Supp. 3d 614, 617 (S.D.N.Y. 2014) (quoting *Harold Collins*, [1986–87 Transfer Binder] Comm. Fut. L. Rep. (CCH), ¶ 22,982 at 31,903 (C.F.T.C. April 4, 1986), *rev'd on other grounds sub nom. Stoller v. CFTC*, 834 F.2d 262 (2d Cir. 1987)). These trades are made with the intent to avoid taking a genuine position in the market. *Reddy v. CFTC*, 191 F.3d 109, 115 (2nd Cir. 1999). An individual violates § 4c when she enters such a trade intentionally. *Id*. at 119. CFTC need not establish motive, but evidence of motive strengthens the inference of intent. *Id.*

Here, Li engaged in 41 round-turn trades which involved trading outside of normal trading hours, in low-volume contracts. A typical transaction would involve Li placing an order for a quantity of Eurodollar contracts at a certain price using the Kering Account. She would then place a second order using the Tanius Account on the opposite side of the market (e.g., buying with the Kering Account and selling with the Tanius Account) for the same product, quantity, and price. After these orders were matched and the trade completed, Li then entered into an offsetting transaction in which she would enter an order to sell the same quantity of Eurodollar futures from the Kering Account and an order to buy the same quantity from the Tanius Account closing out the position taken in the first trade. Li placed the orders for Tanius and Kering nearly simultaneously and outside of normal trading hours, typically after midnight, effectively eliminating any risk of trading with a third party. These facts are sufficient to show that Li intentionally engineered and engaged in trades that were designed to give the appearance of taking place on the open market, while in reality structured to avoid market risk. This is

sufficient to establish a violation § 4c and the Court grants CFTC summary judgment on Count II.

### 3.    *Violation of CFTC Regulation 1.38(a) (Count III)*

CFTC alleges that Li violated Regulation 1.38(a), which requires that all purchases and sales of futures be executed "openly and competitively," by engaging in the round-turn trades described above. Conduct that violates § 4c also violates Reg. 1.38(a). *Moncada*, 31 F. Supp. 3d at 617. Li did not include any response to this allegation in her Response to the motion for summary judgment. For the reasons stated above regarding § 4c, the Court grants the CFTC summary judgment on Count III.

### 4.    *Vicarious Liability of Kering*

CFTC seeks to hold Kering vicariously liable for Li's violations of §§ 4b and 4c and Regulation 1.38(a) because she was acting as Kering's agent when she committed the violations. The Act holds principals strictly liable for violations of the Act carried out by their agents when those agents were acting within the scope of their employment. *See* 7 U.S.C. § 2(a)(1)(B); *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988). The principal is liable even if it did not participate in or know of the violation. *Id.* Kering does not dispute that it employed Li during the relevant period; the only question is whether Li was acting within the scope of her employment or furtherance of her agency when engaging in the illegal transactions. *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966–67 (7th Cir. 1986).

Whether an employee was acting within the scope of her employment is a question of fact and turns "on an overall assessment of the totality of the circumstances in each case." *In the Matter of Gary Glass & Zoltan (Lou) Guttman*, CFTC No. 93-4, Comm. Fut. L. Rep. P 26,787 1996 WL 518121, at *9 (Sept. 11, 1996) (quoting *Berisko v. E. Capital Corp.*, [1984–

13

1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,772 at 31,223 (CFTC 1984)).  Where there is no dispute as to any material fact regarding whether the employee was acting within the scope of her employment, the Court may decide the issue as a matter of law.  *See, e.g.*, *CFTC v. Schafer*, No. CIV.A. H-96-1213, 1997 WL 33547409, at *7 (S.D. Tex. Dec. 23, 1997).

There is no dispute that as part of her employment with Kering, Li had broad authority to engage in futures trading on the Kering Account.  She was the only trader working for Kering at that time and she was solely responsible for developing, overseeing, and executing the futures trading strategy on behalf of Kering.  She engaged in each of the illegal trades using the Kering Account and with the purpose of transferring money to Kering.  Trading in commodity futures for the benefit of Kering is exactly why Kering employed Li and the illegal acts in which she engaged were squarely within this scope.

Kering argues that it never authorized Li to engage in the illegal trades and therefore she was acting outside of her authority.[4]  It is irrelevant, however, whether or not Kering authorized Li to engage in the illegal trades.  *Mast v. Best Commodities Servs., Inc.*, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. ¶ 23,380 at 33,038–33,039 (CFTC Dec. 2, 1986) (liability of principal not defeated by claims that agent was not authorized to act fraudulently).  If an employer could avoid liability simply by not affirmatively authorizing illegal conduct, § 2(a) would be rendered a nullity.  Thus, this argument fails.

---

[4] It is significant that Kering failed to take any action that an employer typically does once the employer learns that an employee has "gone rogue."  Kering did not fire Li, immediately return the funds to Tanius, or cooperate with the investigation.  Instead, Kering attempted to withdraw the Tanius funds from its account once Tanius discovered the fraud and continues a willingness to work with Li, as evidenced by Li's assertion that she intends to return to the United States and trade futures on Kering's behalf.  These facts lead to the inference that while Kering may not have authorized Li's fraudulent conduct beforehand, it certainly appears to have ratified the fraudulent conduct once discovered, thus undermining Kering's "gone rogue" argument.

Kering finally argues that it cannot be held liable because it is a retail customer, not a registered futures merchant. Kering offers no case law or statutory support for this argument, simply concluding, "It is wrong to punish an unsophisticated client because the expert trader it retained engaged in wrongdoing." Doc. 70 at 4. The language of § 2(a) is broad, and extends vicarious liability to "any individual, association, partnership, corporation, or trust." 7 U.S.C. § 2(a)(1)(B). There is no language limiting its applicability to registered futures merchants or exempting retail customers. Therefore, the Court finds Kering is not exempt from vicarious liability under § 2(a).

The undisputed facts, supported by admissible evidence, establish that Li violated §§ 4b and 4c as well as Regulation 1.38 as a matter of law. Additionally, because the undisputed facts demonstrate that Li was acting within the scope of her employment with Kering when conducting the illegal trades in question, Kering is vicariously liable for Li's violations pursuant to § 2(a). Therefore, the Court grants CFTC summary judgment as to liability on Counts I, II, and III. The Court turns next to the appropriate remedy.

## C.    Remedy

CFTC seeks disgorgement of the ill-gotten gains from Kering, a civil penalty of three-times the ill-gotten gains jointly and severally from Li and Kering, a permanent injunction banning Li from interacting in any way with the commodities market, a permanent injunction on Kering enjoining it from directly or indirectly granting Li access to its commodity futures trading accounts or allowing Li to control or direct commodity futures trading on behalf of Kering, and a permanent injunction on both Li and Kering restraining them from future violations of the Act. For the reasons stated below, the Court finds that disgorgement of all ill-gotten gains, a civil penalty equal to three-times the ill-gotten gains, a five-year trading ban on Li, a five-year

injunction on Kering interacting with Li in any way regarding commodity futures trading, and a permanent injunction on both Li and Kering Capital restraining them from violating the Act is appropriate in this case.

### 1. Disgorgement

CFTC seeks disgorgement of $300,462.50 from the Kering Account. Neither Kering nor Li object to disgorgement of these funds. The Court has authority to order disgorgement to further the purpose of the Act. *See CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 584 (9th Cir. 1982) (holding that it would frustrate the regulatory purposes of the Act if a violator were allowed to keep his ill-gotten gains). Therefore, the Court orders Defendants to return the $300,462.50, plus post-judgment interest, to the Tanius Account or in the alternative authorizes the Futures Commission Merchant holding the Kering Account to release the frozen funds directly to the Tanius Account.

### 2. Civil Penalty

CFTC seeks a civil penalty against Defendants equal to three times their illicit gains—$901,387.50. Under the Act, CFTC may seek a maximum civil penalty of up to three times the ill-gotten gains or $140,000 for each violation whichever is greater. 7 U.S.C. § 13a-1(d)(1); 17 C.F.R. § 143.8(a)(2). The fine amount must also be "rationally related to the offense." *Monieson v. CFTC*, 996 F.2d 852, 864 (7th Cir. 1993). The Court looks to three factors to determine if the fine is rationally related to the offense: (1) the nature of the violations, (2) the injury caused by the violations, and (3) penalties used in similar cases. *Id.*

The nature of the violations is fraud and fictitious trades. Li repeatedly engaged in illegal pre-arranged trades, intentionally designed to take money from her employer, Tanius, and transfer it to Kering without incurring any market risk. She did this in a manner designed to evade detection and spread over six separate occasions. This is a severe violation and one that

cuts to the heart of the purpose of the Act: to protect "all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C § 5(b).

The injury caused by the violations is $300,462.50 transferred from Tanius to Kering. Furthermore, Li's actions have undermined public confidence in the commodities markets. This harm is more insidious and damaging than the stolen funds themselves. Congress created CFTC to promote efficiency, transparency, and fairness in the commodities markets and when a trader fraudulently steals money from her employer and engages in pre-arranged trades, it harms the public trust in the markets, which Congress has set out to promote and protect. *See CFTC v. Sarvey*, No. 08 C 192, 2012 WL 426746, at *6 (N.D. Ill. Feb. 10, 2012). Therefore, this is a serious offense, meriting a serious penalty.

Courts in similar cases have imposed civil penalties equal to three times the ill-gotten gains, and in some cases, at the statutory maximum. In *CFTC v. Garofalo*, No. 10-CV-2417, 2011 WL 4954082, at *7 (N.D. Ill. May 5, 2011), the court imposed a civil penalty of three times the ill-gotten gains. The defendant in that case engaged in conduct similar to that of Li. Over the course of one evening, the defendant participated in 119 fictitious sales between his account and that of an investment firm over which he had obtained control. His efforts resulted in a loss of $614,925 for the victim and an equal gain for himself. *Id.*; *see also CFTC v. Brockbank*, 505 F. Supp. 2d 1169, 1177 (D. Utah 2007), *aff'd*, 316 F. App'x 707 (10th Cir. 2008) (imposing the "highest possible" civil penalty where the defendant engaged investor fraud); *CFTC v. Sarvey*, No. 08 C 192, 2012 WL 426746, at *6 (N.D. Ill. Feb. 10, 2012) (imposing civil penalty equal to three times the ill-gotten gains where two traders engaged in fictitious sales to fraudulently transfer money from one trader's clients to the personal account of the second trader).

In cases where the only charged offense was a violation of § 4c, courts have routinely imposed civil penalties approximately equal to the amount of the ill-gotten gains. *See, e.g.*, *CFTC v. Singhal*, Case No. 12-cv-00138, Doc. 32 (N.D. Ill. Nov. 28, 2012) (imposing a civil penalty of $140,000 where defendant transferred $118,868.75 between two accounts using fictitious trades). But here, Li did not only violate § 4c, she also violated § 4b, and thus *Singhal* and other simple § 4c cases are not helpful comparators. A penalty equal to three times the ill-gotten gains is not out of step with cases in which a defendant defrauded a customer <u>and</u> engaged in pre-arranged sales as occurred here.

In arguing for a lower penalty Li states that the Court should consider the following factors when setting the fine:

> (i) the seriousness of the violations as determined by the relationship of the violation to the regulatory purpose; (ii) whether the violation was an isolated mistake arising from an ambiguous statutory duty or from circumstances that are unique or unforeseeable; (iii) the particular mitigating and aggravating circumstances presented by the unique facts of the conduct at issue; (iv) any benefit to the violator; (v) any harm to the investors; (vi) any attempt to cure the violations; (vii) post-violation conduct; (viii) cooperation with authorities; and (ix) any attempt to provide restitution.

Doc. 55 at 10–11. Li contends that in light of these factors,[5] the Court should impose a minimal penalty or no penalty at all. Li proceeds to go through each of her proposed factors in turn. The Court declines to evaluate each factor individually, but addresses Li's argument in its entirety.

As noted above, Li's violations strike at the central purpose of the regulatory framework Congress has devised around the commodities market, to protect "all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C § 5(b). Yet

---

[5] Li refers to these factors as the "*Levy* factor[s]," in reference to *CFTC v. Levy*, 541 F.3d 1102 (11th Cir. 2008), but it is not clear why. These factors are not contained in *Levy*, and the court in *Levy* affirmed a civil penalty well in excess of three times the ill-gotten gains. The Court indulges Li and addresses these factors, despite her pointing to no valid authority requiring the Court to do so.

Li argues that her conduct does not implicate a core provision of the Act and "at worst, involved money pass transaction and not price manipulation or fraud."  Doc. 55 at 11.  The Court disagrees.  Li illegally transferred over $300,000 from her employer's account to another account controlled by her and owned by her mother.  She did so without her employer's knowledge or consent, in a manner designed to avoid detection.  She engaged in this behavior on six separate occasions over two months.  This is not a simple money pass case, and Li's suggestion to the contrary is confusing at best.[6]

Li's violations did not result from any unique circumstances.  She argues that she engaged in the illegal trades because the hostile work environment at Tanius drove her to think that "executing these trades was the only way in which she would receive the compensation that she believed Tanius owed to her."  Doc. 55 at 14–15 (quoting Doc. 46 ¶ 76).  While the allegations of mistreatment are concerning, they do not provide a mitigating basis for her conduct.  Li provides no citation in support of the contention that this constitutes unique, mitigating circumstances.  Her argument is essentially that her employers at Tanius were exceedingly cruel to her and they broke the law too; therefore, she should not be punished for breaking the law.  If what Li alleges about her treatment at Tanius is true, she had numerous legitimate options to address her mistreatment that did not involve violating the Act.

Li next presents several arguments that can only be described as misguided and unhelpful.  First she argues that she did not benefit from the trading because of the asset freeze the Court placed on the assets in the Kering Account.  She argues in the alternative that if the Court determines she did benefit from the illegal trades, "those funds represented monies that

---

[6] Li also argues that she did not know at the time that the transactions were wrongful.  This is perhaps the most preposterous claim of all.  The Court finds it difficult to believe that someone as well educated, privileged, and having as much family support as Li does not understand the basic concept, as taught to *children* around the globe, that it is wrong to steal and lie.

Ms. Li believed were owed to her by Tanius and Middlemiss." Doc. 55 at 15. Li is wrong on all points. First, the mere fact that CFTC was able to act quickly enough to freeze the assets before she could obtain them does not absolve her of her theft. Second, the funds did not belong to her, she stole them. If Li had a legal claim to the money, she should have pursued it in court. This argument demonstrates Li's abject failure to take responsibility for her actions and in no way mitigates her behavior.

Li makes additional arguments about why she should not be penalized for her actions, but they are all similarly unhelpful. Because Li has provided no compelling legal or factual argument as to why a civil penalty of three-times the ill-gotten gains is inappropriate in this case, the Court imposes a civil penalty of $901,387.50 against Li and Kering, jointly and severally.[7]

### 3. *Injunction Against Li*

CFTC seeks a lifetime trading ban in the commodity futures market as well as a permanent injunction against future violations of the Act against Li. An injunction is appropriate where a violation has occurred and there is a reasonable likelihood of future violations. *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). The Court should consider the totality of the circumstances when determining whether future violations are likely to occur. *Id.* The Court should look at the egregiousness of the conduct, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of her conduct, and the likelihood the defendant's occupation will present opportunities for future violations. *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008).

---

[7] Kering also argues that CFTC has failed to meet its burden of demonstrating collectability of the civil penalty. Collectability is no longer a requirement of imposing a civil penalty. *See Brenner v. CFTC*, 338 F.3d 713, 723 (7th Cir. 2003) (collectability no longer a consideration for conduct occurring after 1992 amendment to the Act).

A trading ban is an appropriate remedy for Li's misconduct. As discussed above, her violation was severe and directed at the central purpose of the Act. Her conduct was not isolated, but occurred on six separate occasions over two months. The clear-cut nature of her fraud and the way in which she carried it out makes it clear that she did so with scienter. Li contests this point, but in light of the undisputed facts it is not credible that she did not know that her actions were wrongful. The Court also does not view Li's assurances that she will avoid wrongful conduct in the future as sincere. To date, she continues to provide excuses for her misconduct and has failed to fully cooperate with the investigation. It appears that Li has failed to fully internalize the wrongfulness of her conduct and is therefore more likely to repeat it in the future. Finally, Li's stated intention is to return to the United States and resume trading in commodities following the resolution of this case. This is the exact profession where she would likely be able to carry out future violations of the Act. The Court therefore finds that her risk of reoffending is high.

The Court finds that a five-year trading ban and a permanent injunction against future violations of the Act are necessary to protect the public and are reasonable in light of prior CFTC actions. *See, e.g.*, *In the Matter of Zhang*, CFTC Doc. No. 14-33, Order dated Sept. 29, 2014 (five-year trading ban for violation of § 4c and no allegation of fraud); *CFTC v. Singhal*, No. 12-cv-00138, Doc. 32 (N.D. Ill. Nov. 28, 2012) (five-year trading ban for violation of § 4c and no allegation of fraud and imposing a permanent injunction on future violations of the Act); *Ryan v. CFTC*, 145 F.3d 910, 916 (7th Cir. 1998) (affirming six-year trading ban for violations of §§ 4b and 4c); *LaCrosse v. CFTC*, 137 F.3d 925, 936 (7th Cir. 1998) (affirming five-year trading ban CFTC imposed on defendant following a criminal conviction for violation of § 4b); *Monieson v. CFTC*, 996 F.2d 852, 862 (7th Cir. 1993) (affirming a two-year trading ban where defendant was

a controlling person who failed to supervise parties who violated § 4b); *cf. CFTC v. Capitalstreet Financial, LLC*, No. 3:09–cv–387–RJC–DCK, 2012 WL 79758, at *12 (W.D.N.C. Jan. 11, 2012) (imposing a permanent trading ban for violation of § 4b where defendants operated a "Ponzi" scheme in which they misappropriated over one million dollars from customers and concealed over $200,000 in trading losses from customers); *CFTC v. Harrison*, No. 8:13–cv–00327–JDA, 2015 WL 1322837, at *1-2 (D.S.C. Mar. 23, 2015) (imposing permanent trading ban in fraud case where defendant was sentenced to one year and one day in prison in related criminal case).

### 4. *Injunction Against Kering*

CFTC also seeks a permanent injunction against future violations of the Act by Kering as well as a permanent injunction preventing Kering from granting Li access to its futures trading accounts and from relying on Li for trading advice or direction. An injunction against Kering is appropriate if Kering violated the law and is likely to violate the law in the future. *Hunt*, 591 F.2d at 1220.

As discussed above, Kering is vicariously liable for violations of the Act Li committed in the scope of her employment. Kering granted Li essentially unfettered access to trade on its account and she used that access to violate the Act. Li did this using her mother's trading account. This arrangement made it difficult for CFTC to detect Li's role in Kering's trading activity, and this difficulty supports the need to also enjoin Kering to protect the market from future violations by Li. To date there is no evidence that Kering has taken any steps to limit its relationship with Li, including termination of her employment. Therefore the Court finds a limited injunction against Kering is necessary to prevent future violations of the Act by Kering and Li. The Court imposes a five-year injunction prohibiting Kering from granting Li access to

its futures trading accounts and from relying on Li for trading advice or direction. The Court also imposes a permanent injunction against future violations of the Act by Kering.

## CONCLUSION

For the foregoing reasons, the Court grants CFTC's motion for summary judgment [47]. The Court orders Defendants to disgorge $300,462.50, plus post-judgment interest, in ill-gotten gains and return it to the Tanius Account. Additionally, the Court orders Defendants to pay a civil penalty of $901,387.50 to CFTC. The Court enjoins Li from trading in the commodity futures market for five years and permanently enjoins Li from violating the Act. The Court enjoins Kering from allowing Li to trade futures on its account or consulting Li on any futures related matters for five years. The Court also permanently enjoins Kering from future violations of the Act. The Court grants in part and denies in part CFTC's motion to strike [65]. The Court strikes Li's Amended Response to the Joint Statement of Facts and the Morgan declaration. The Court enters judgment for CFTC. The case is terminated.

Dated: December 9, 2016

_____
SARA L. ELLIS
United States District Judge